# United States Court of Appeals
## For the First Circuit

No. 10-2167

ASOCIACIÓN DE SUSCRIPCIÓN CONJUNTA DEL SEGURO DE
RESPONSABILIDAD OBLIGATORIO,

Plaintiff, Appellant,

v.

DORELISSE JUARBE-JIMÉNEZ, in her official capacity as the
Insurance Commissioner of the Commonwealth of Puerto Rico,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Thompson, Circuit Judges.

Veronica Ferraiuoli Hornedo, with whom Nigaglioni and
Ferraiuoli were on brief, for appellant.
Susana I. Peñagaricano-Brown, Assistant Solicitor
General, with whom Irene S. Soroeta-Kodesh, Solicitor General,
Leticia Casalduc-Rabell, Acting Deputy Solicitor General, and Zaira
Z. Girón-Anadón, Acting Deputy Solicitor General, were on brief,
for appellee.

September 29, 2011

**LYNCH**, **Chief Judge**.  At issue is when a facial Takings Clause claim attacking a statute and regulations accrues for statute of limitations purposes.  The district court concluded that the claim here was untimely.  Asociación de Suscripción Conjunta del Seguro de Responabilidad Obligatorio v. Juarbe-Jiménez, 720 F. Supp. 2d 152 (D.P.R. 2010).  We agree and affirm the dismissal of this case.

I.

This case arises out of Puerto Rico's compulsory automobile liability insurance scheme.  In December of 1995 the Commonwealth of Puerto Rico enacted Act 253, which required all motor vehicles to be covered by certain minimum automobile liability insurance.  The purpose of the insurance is to cover "damages caused to motor vehicles of third parties as a result of a traffic accident, for which the owner of the vehicle covered by this insurance is legally liable and which, through its use, has caused said damages."  P.R. Laws Ann. tit. 26, § 8051.

At the same time, the Commonwealth created the Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio (the Association) to provide compulsory liability insurance to those vehicle owners rejected by private insurers or who have opted out of purchasing liability insurance.  We have held that the Association, while it was created "under some direction by the commonwealth," is "private in nature."  Associación de Suscripción

-2-

Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 20 (1st Cir. 2007) (quoting Arroyo-Melecio v. P.R. Am. Ins. Co., 398 F.3d 56, 62 (1st Cir. 2005)) (internal quotation marks omitted). This conclusion has since been reinforced by the passage of Act 201, in December 2009, which amends Act 253 and defines the Association as a "private Association." P.R. Laws Ann. tit. 26, §§ 8052(c), 8055(a), amended by Act 201 of Dec. 29, 2009, arts. 3(c), 6(a). At present, the Association provides compulsory insurance for over 80 percent of the vehicles in Puerto Rico.[1]

---

[1] The compulsory insurance scheme has spawned a great deal of local and federal litigation.

The payment scheme under the Compulsory Liability Insurance Act is chronologically ordered as follows: (1) motorists pay insurance premiums to the Secretary of the Treasury pursuant to P.R. Laws Ann. tit. 26, § 8053(a); (2) the Secretary then transfers those premiums to the Association pursuant to P.R. Laws Ann. tit. 26, § 8055(c); and (3) the Association then places 95 percent of the profits from those premiums in a Special Reserve for the benefit of the public under the Insurance Commissioner's Rule LXX. In this case, the Association alleges that step (3) above effects a regulatory taking.

The Association has also sued the Secretary of the Treasury, challenging another portion of the legislation. Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1 (1st Cir. 2007). In that suit, the Association alleged a taking under step (2) above because the Secretary withheld certain insurance premiums that it was required to transfer to the Association pursuant to § 8055(c). Id. at 11.

In addition, insured automobile owners who have paid for both the compulsory insurance and private insurance have sued the Association, bringing constitutional challenges to the scheme under which they may obtain reimbursement of the double premium. Colón-Rivera v. Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, No. 07-1875, 2010 WL 5376116 (D.P.R.

The legislation which created the Association also gave the defendant Insurance Commissioner the power to regulate it. See P.R. Laws Ann. tit. 26, § 8055(c), (f). In 1996, through Regulation 5493, called Rule LXIX, the Commissioner set up a scheme which required the Association to annually determine its profits and losses in the same manner as in the Annual Statement required by the Insurance Code. More pertinently, that Rule also provided:

> The Members shall share in the annual profits and losses of the Association in the proportional participation of each of the Members for the year for which such profit or losses are determined.

The "members" are all of the insurance carriers who are licensed to offer automobile insurance in Puerto Rico and underwrite more than one percent of the total volume of such premiums in Puerto Rico. P.R. Laws Ann. tit. 26, §§ 8052(b), 8055(a).

That allocation of profit was changed by the Commissioner in December 2000, by revisions contained in Regulation 6254, Rule LXX, as follows:

> The members shall share in the annual profits or losses of the Association in the proportional participation of each of the members for the year for which such profits or losses are determined. With regards to the

Dec. 27, 2010), appeal docketed, No. 11-1148 (1st Cir. Feb. 10, 2011). In a separate case, a group of insured automobile owners who have paid for both types of insurance have brought similar claims against the Governor and Secretary of the Treasury of Puerto Rico. Garcia-Rubiera v. Fortuño, 752 F. Supp. 2d 180 (D.P.R. 2010), appeal docketed, No. 10-2507 (1st Cir. Dec. 22, 2010).

-4-

> participation in the profits, the same shall
> not exceed the maximum percentage established
> in the premium dollar for the profit, applying
> the earned premiums for said year.
>
> The profit for each year in excess of the
> amounts distributed due to the participation
> provided for in this paragraph shall be
> accumulated in a special reserve that shall be
> exclusively used for the future stabilization
> of the premiums of the compulsory liability
> insurance and the future expansion of the
> benefits provided there under. Under no
> circumstance shall the excess accumulated in
> this reserve be used for the distribution of
> profits provided for in the previous
> paragraph.

Pursuant to this December 2000 regulation, which is located in Article 20(e) of Rule LXX, the Commissioner established that the Association's members may receive a distribution of up to a maximum of five percent of the annual premium profits.[2] The remaining 95 percent of the profits must be placed in the Special Reserve, where they must remain until the Association chooses to use them to stabilize premiums or expand benefits. Neither the

---

[2] It is unclear from where this five percent limit originated. In 1999, the Association's board approved a five percent distribution, and stated in a letter to the Commissioner that this distribution was "for an amount equal to the portion of each premium dollar earmarked as profits during said period, which we understand is five percent (5%)." The Commissioner approved of the distribution, noting that it "corresponds to the underlying premium dollar distribution . . . [a]s presented to the Government Commission of the Puerto Rico Senate, on July 15, 1995, and to the Consumer Affairs Commission of the Puerto Rico House of Representatives on July 19, 1995, in corresponding requests." The complaint does allege that the Commissioner sets the percentage, and the defendant's brief agrees.

Association, nor its members, challenged this rule when it was enacted.

Eventually, the Commissioner required an audit of these distributions and the Special Reserve fund. On June 12, 2008, the Commissioner issued a resolution resulting from an audit of the Association for the period from July 1, 2001 to December 31, 2004. In the resolution, the Commissioner stated that distributions to members were capped at five percent of the annual premium profits and could not include any distribution of investment income[3] or "other" income.[4] All investment and "other" income must be placed in the Special Reserve.

The resolution also indicated that distributions to members in any given year could not exceed the net underwriting gain for that year. Based on the audit findings, the resolution ordered the Association to recover $8,266,767 in non-complying distributions issued to members for the 2001-2004 audit period.

---

[3] The Association's investment income is generated by the investment of Association assets in bonds, stocks and other investment vehicles. It is unclear whether the investment income at issue is derived solely from investments of Special Reserve funds, or whether it also includes investments of other Association funds.

[4] The Association's "other" income accounts for all income of the Association derived from sources other than the insurance business or investments. Examples of the Association's "other" income include legal settlements or judgments, and income from the sale or decommissioning of Association assets such as furniture or Association cars.

Additionally, because the Association realized a net underwriting loss in 2005, the Association was directed to recover the full distribution to members in that year, amounting to $7,593,556.[5]

The Puerto Rico Court of Appeals upheld these portions of the audit against claims by the Association that the Commissioner lacked statutory authority to impose restrictions on the distribution of investment and other income.[6]  Comm'r of Ins. v.

---

[5] Before the audit, the Association itself had interpreted Rule LXX as requiring that its distribution not exceed five percent of the earned underwriting premiums, but permitting distribution of income earned from investments and other sources up to this limit. Thus, even if the net result of the insurance business (the earned premiums minus the benefits paid out and operating costs) was negative, the Association would pay distributions out of profits from investment and other income, up to the cap of five percent of the gross premiums.  There is no claim that the Insurance Commissioner knew of or acceded to the Association's interpretation.

[6] The current statutory authority of the Commissioner to regulate the Association's distribution of profits, and thus the validity of Article 20(e) of Rule LXX, is disputed.  In December 2009, Puerto Rico passed Act 201, which amends Act 253 in a variety of ways.  As is relevant here, Act 201 removes the portion of Act 253 which stated that the Commissioner "shall provide through regulations the manner and form in which the distribution" shall take place, and the portion providing the Commissioner authority to "establish through regulations the structure and operation of the Joint Underwriting Association."  P.R. Laws Ann. tit. 26, § 8055(c), (f).  Instead, under Act 201, "[t]he operational plan of the Joint Underwriting Association shall provide the form and manner in which the distribution of the amount of the premiums received by the Joint Underwriting Association will be carried out."  P.R. Laws Ann. tit. 26, § 8055(c), amended by Act 201 of Dec. 29, 2009, art. 6(c).  The operational plan is to be established by the Association; the Commissioner is only to be "notified" of the plan.  P.R. Laws Ann. tit. 26, § 8055(f), amended

-7-

<u>Compulsory Liab. Ins. Joint Underwriting Ass'n</u>, No. E-2005-62, KLRA200801403 (P.R. Cir. May 19, 2009).[7]

The Association asserts that it has complied with these requirements in the sense that it has put into the Special Reserve all income in excess of the amount it was allowed to distribute to its members. It is unclear whether the Association has complied with the audit resolution. As of December 31, 2008, the Special Reserve contained $159,267,250 in undistributed profits.

The Association protests that it cannot be made to place all of the profits (aside from the five percent distribution to its members) into the Special Reserve fund, to be used only for the benefit of the consumer insureds, because these restrictions amount to an unconstitutional taking. It also makes on appeal a related argument that it cannot be forced to include in this Reserve its investment income and its other income, as is required by the 2008 audit resolution.

II.

---

<u>by</u> Act 201 of Dec. 29, 2009, art. 6(f).
    A Puerto Rico court of first instance has held that, given Act 201, the Commissioner no longer has authority to regulate the distribution of the Association. <u>See</u> <u>Asociación Suscripción Conjunta del Seguro de Responsabilidad Obligatorio</u> v. <u>Juarbe Jiménez</u>, No. K PE 2008-3826 (P.R. Gen. Ct. of J. Mar. 16, 2011).

    [7] We are told that decision has been appealed to the Puerto Rico Supreme Court.

-8-

On November 4, 2008, the Association brought suit against Puerto Rico Insurance Commissioner Dorelisse Juarbe-Jiménez pursuant to 42 U.S.C. § 1983, arguing that the Insurance Commissioner's limitation on the distribution of profits to the Association's members, in conjunction with the restrictions placed on the use of the Special Reserve funds, constituted a taking without just compensation in violation of the Fifth Amendment's Takings Clause. The complaint requested a declaration that Article 20(e)(2) of Rule LXX was unconstitutional under the Takings Clause and that the Commissioner be enjoined from enforcing that provision.

The Commissioner filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the basis that the Association's claim was unripe because the Association had failed to seek compensation through Puerto Rico's inverse condemnation procedures. See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985); Downing/Salt Pond Partners, L.P. v. Rhode Island, 643 F.3d 16 (1st Cir. 2011).

Attempting to avoid this ripeness problem, the Association conceded, in its "Opposition to Motion to Dismiss," that its claim "would be unripe" if the claim were an as-applied claim, but asserted that because what it had "mount[ed] [was] a facial challenge to the regulation," its claim was ripe the moment that Rule LXX was issued.

On November 16, 2009, the Association and the Commissioner filed cross-motions for summary judgment. On June 25, 2010, the district court granted the Commissioner's motion for summary judgment and denied the Association's motion because it determined that the Association's facial challenge to Rule LXX was time-barred by the statute of limitations. Asociación de Suscripción, 720 F. Supp. 2d at 159. The district court reasoned that because the Association was bringing a facial challenge to Rule LXX, the statute of limitations accrued when Rule LXX was enacted on December 28, 2000. Id. at 157. Further, the district court explained, § 1983 claims in Puerto Rico carry a one-year statute of limitations. Id. (citing Morán-Vega v. Cruz-Burgos, 537 F.3d 14, 20 (1st Cir. 2008)). Because the Association did not file its complaint until November 4, 2008, the district court determined that its claim was time-barred. Id. at 157, 159.

## III.

"Our review of the grant of summary judgment is de novo, taking all facts and reasonable inferences in the light most favorable to [the Association], the nonmoving party." Sterling Merch., Inc. v. Nestlé, S.A., No. 10-1925, 2011 WL 3849828, at *6 (1st Cir. Sept. 1, 2011).

As filed, the Association's suit raised a claim that Rule LXX, on its face, constitutes a taking. At times it appeared the Association was also asserting a claim that Rule LXX, as applied

each year to the Association, constitutes a taking.  Later during the litigation, the Association's briefing mentioned that the 2008 audit, specifically the audit resolution's interpretation that investment income and other income must be placed in the Special Reserve, constitutes a separate taking.

A.  The Association's Facial Challenge to Rule LXX

The Association raised only a facial challenge to Rule LXX.  The complaint, which was never amended, states only one cause of action: "Violations of the Taking Clause of the U.S. Constitution."  The factual allegations underpinning this claim focus entirely on Rule LXX — the Association contends that because "Rule LXX provides that the funds accumulated in the Special Reserve are to be used exclusively for a public purpose and only for the benefit of the public in general," the Rule "provides for a taking of [the Association's] private property by denying [the Association] of any beneficial use of its property."

The relief sought is also relevant to whether the claim is a facial claim.  Here, the relief requested is a declaration that Article 20(e)(2) of Rule LXX is unconstitutional, and an injunction prohibiting its enforcement, rather than a request for a declaration that a particular interpretation or application of Rule LXX effects a taking.  This requested relief also indicates that the Association mounts a facial, rather than an as-applied, attack on the Rule.  See Doe v. Reed, 130 S. Ct. 2811, 2817 (2010)

-11-

(noting that when the "relief that would follow" from a claim "reach[es] beyond the particular circumstances of these plaintiffs," the plaintiffs must "satisfy our standards for a facial challenge to the extent of that reach").

This attack on Rule LXX falls squarely within the Supreme Court's definition of a facial taking: "a claim that the mere enactment of a statute constitutes a taking," as opposed to an as-applied claim that "the particular impact of government action on a specific piece of property requires the payment of just compensation." Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 494 (1987). It is clear that facial challenges may be mounted on regulations; Keystone Bituminous itself involved an assessment of whether certain regulations constituted a taking. Id. at 474, 493.

More recent cases also distinguish facial from as-applied takings claims. In Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302 (2002), the Court noted that "[p]etitioners make only a facial attack on Ordinance 81-5 and Resolution 83-21. They contend that the mere enactment of a temporary regulation that, while in effect, denies a property owner all viable economic use of her property gives rise to an unqualified constitutional obligation to compensate her for the value of its use during that period." Id. at 320; see also Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 736 & n.10 (1997)

("[T]he only issue justiciable at that point was whether mere enactment of the statute amounted to a taking. . . . Such facial challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an uphill battle, since it is difficult to demonstrate that mere enactment of a piece of legislation deprived [the owner] of economically viable use of [his] property." (alterations in original) (internal quotation marks and citations omitted)).

Beyond that, the Association's position, for strategic reasons, has been that it is mounting a facial attack, and we consider it bound by this position. It took this position in order to argue it did not need to comply with <u>Williamson County</u>'s ripeness requirements. The district court relied on this distinction in denying the Commissioner's motion to dismiss, and explained that "[g]iven that Plaintiff is mounting a facial challenge to Rule LXX, the Court finds that Plaintiff's claims are ripe for review and that the Court's subject matter jurisdiction is not foreclosed by the <u>Williamson County</u> requirements."[8]

---

[8] In response to a motion to dismiss arguing that the Association had failed to satisfy <u>Williamson County</u>'s ripeness requirements, the Association argued that "[w]hile the Insurance Commissioner is correct that a claim that Rule LXX affects a regulatory taking <u>as applied</u> to the [Association's] property would be unripe for this reason, the [Association] mounts a <u>facial</u> challenge to the regulation." The Association further clarified that "[i]n this case, the [Association] has alleged a facial challenge to the section of Rule LXX which establishes the Special Reserve."
The Association's opposition to the Commissioner's motion

-13-

Nevertheless, the Association now argues that it should be permitted to change its position based on an intervening Supreme Court decision, and that its case should not be treated as solely a facial attack. It argues that Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010), has relaxed the distinction between facial and as-applied claims. The Association points to the majority's statement that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Id. at 893.

Even aside from whether the Association is judicially estopped from changing its position, the argument fails. Whatever merit the Association's argument might have in the First Amendment context, Citizens United did not purport to change the well-established rules as to facial challenges under the Takings Clause.[9]

_____

for summary judgment further reinforces that the Association's challenge to Rule LXX was facial, rather than as-applied.

[9] Cf. Metzger, Facial and As-Applied Challenges Under The Roberts Court, 36 Fordham Urb. L.J. 773, 798 (2009) ("[S]ubstantive constitutional law drives the Court's approach to facial and as-applied challenges. That substantive constitutional law determines the availability of facial challenges has long been acknowledged, and is not a new development with the Roberts Court."); Fallon, As-Applied And Facial Challenges And Third-Party Standing, 113 Harv. L. Rev. 1321, 1324 (2000) ("[T]he availability of facial challenges varies on a doctrine-by-doctrine basis and is a function of the applicable substantive tests of constitutional

The Supreme Court has explained that there is "an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation." Keystone Bituminous, 480 U.S. at 494 (emphasis added); see also Brubaker Amusement Co. v. United States, 304 F.3d 1349, 1356 (Fed. Cir. 2002) ("The Supreme Court has repeatedly emphasized a distinction between takings claims that arise in the context of facial challenges and those that arise in the context of challenges to the application of a statute or regulation to a particular piece of property."). Not only has the Court outlined the appropriate test to be used in a facial Takings Clause challenge — whether the passage of the statute "denies an owner economically viable use of his land," Keystone Bituminous, 480 U.S. at 495, but it has also explained that facial challenges are not subject to the second portion of Williamson County's ripeness analysis, San Remo Hotel v. City & Cnty. of S.F., 545 U.S. 323, 345-46 (2005); Yee v. City of Escondido, 503 U.S. 519, 533-34 (1992); see also Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 686 (9th Cir. 1993) (noting that facial and as-applied takings claims "raise[] different ripeness and statute of limitations issues"). As a result, it is clear that the Association raised only a facial challenge with respect to Rule LXX.

---

validity.").

This facial challenge was barred by the statute of limitations.[10]

The Association's takings claim was brought under 42 U.S.C. § 1983. Section 1983 does not contain its own statute of limitations; instead, the courts apply the state's personal injury statute of limitations to all § 1983 claims, regardless of the underlying law on which the claim is based. Owens v. Okure, 488 U.S. 235, 240-41 (1989). In Puerto Rico, the relevant limitations period is one year. P.R. Laws Ann. tit. 31, § 5298(2); Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) ("In Puerto Rico, the limitations period for personal injuries is one year."). Further, "[i]t is federal law" that governs "when the statute of limitations begins to run." Gorelick v. Costin, 605 F.3d 118, 121 (1st Cir. 2010). Section 1983 claims accrue "when the plaintiff knows, or has reason to know of the

_____

[10] The Commissioner timely raised the statute of limitations defense in both the answer and motion for summary judgment. Because the statute of limitations is an affirmative defense, see Fed. R. Civ. P. 8(c)(1), "the defendant bears the burden of establishing its applicability. The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence he provides on that issue is conclusive." Torres Vargas v. Santiago Cummings, 149 F.3d 29, 36 (1st Cir. 1998) (internal citations omitted). Once the defendant produces such evidence, the burden shifts to the plaintiff to establish that the statute of limitations does not apply. See Fed. R. Civ. P. 56(c), (e); Citigroup Inc. v. Fed. Ins. Co., No. 10-20445, 2011 WL 3422073, at *3 (5th Cir. Aug. 5, 2011); Campbell v. Grand Trunk W. R.R. Co., 238 F.3d 772, 775 (6th Cir. 2001); Blue Cross & Blue Shield of Ala. v. Weitz, 913 F.2d 1544, 1552 (11th Cir. 1990).

injury on which the action is based, and a plaintiff is deemed to know or have reason to know at the time of the act itself and not at the point that the harmful consequences are felt." Id. at 122 (quoting Morán-Vega, 537 F.3d at 20) (internal quotation marks omitted).

In the context of a facial takings challenge, the limitations period accrues when the purportedly unconstitutional statute or regulation is enacted or becomes effective. This is so because, in such cases, the plaintiff alleges that the "mere enactment of a statute constitutes a taking." Keystone Bituminous, 480 U.S. at 494.

It is true that the question of "ripeness" of a takings claim is analytically distinct from the question of when a takings claim accrues for statute of limitations purposes. See Downing/Salt Pond, 643 F.3d at 20-22 (explaining Takings Clause ripeness requirements); Addington v. U.S. Airline Pilots Ass'n, 606 F.3d 1174, 1182 n.6 (9th Cir. 2010) (explaining, in a non-takings case, that while ripeness and accrual are related, "there are key differences in the posture of a case that presents a statute of limitations issue and one that presents a ripeness issue"). And none of the Supreme Court takings cases we have cited are concerned with the accrual of claims for statute of limitations purposes.

Nevertheless, it is clear that a facial takings challenge accrues at the time the offending statute or regulation is enacted

or becomes effective.[11]   A facial challenge also becomes ripe at that time.   The courts that have considered the relationship between ripeness and accrual in the takings context have reached this conclusion, reasoning that because the constitutional injury is not complete until the claim becomes ripe, the statute of limitations cannot accrue before that point in time.   Norco Constr., Inc. v. King Cnty., 801 F.2d 1143, 1146 (9th Cir. 1986) (Kennedy, J.) (holding, in the takings context, that "[t]he conclusion that a claim is premature for adjudication controls as well the determination that the claim has not accrued for purposes of limitations" because "[c]ourts have held consistently that a cause of action does not accrue until a party has a right to enforce the claim"); Hensley v. City of Columbus, 557 F.3d 693, 696-97 (6th Cir. 2009) (holding that the statute of limitations accrues when the takings claim becomes ripe); New Port Largo, Inc. v. Monroe Cnty., 985 F.2d 1488, 1496-97 (11th Cir. 1993) ("When Williamson's two-prong test is met, the injury is complete, and the claim accrues for purposes of the statute of limitations."); Biddison v. City of Chicago, 921 F.2d 724, 728 (7th Cir. 1991) (following Norco)

We agree with this conclusion.   While the ripeness and accrual questions are conceptually distinct, as a functional

---

[11]   This case does not require us to assess the precise moment of accrual when the date of enactment differs from the date the statute or regulation becomes effective.

-18-

matter, given the way the Court has formulated the <u>Williamson County</u> ripeness requirements, and the takings law on facial attacks, a facial takings challenge generally both ripens and accrues for statute of limitations purposes at the same moment in time. <u>See</u>, <u>e.g.</u>, <u>Suitum</u>, 520 U.S. at 736 n.10 (noting that "'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed" (quoting <u>Keystone Bituminous</u>, 480 U.S. at 495)).

Here, Rule LXX was promulgated, in its current form, on December 28, 2000. The Association was on notice, as of that date, of the supposed taking of what it considers to be its property. As a result, the Association's claim that Rule LXX is an unconstitutional taking accrued on that date, and the statute of limitations ran one year later. The Association did not file suit until November 4, 2008 and its suit is time-barred.

The Association's arguments based on analogy to the continuing violation doctrine in employment fail and miss the point. Even under that doctrine, the "ongoing injuries" or harmful "effects" of a single unlawful act do not extend the limitations period. <u>Jensen</u> v. <u>Frank</u>, 912 F.2d 517, 523 (1st Cir. 1990); <u>see also</u> <u>Gilbert</u> v. <u>City of Cambridge</u>, 932 F.2d 51, 58-59 (1st Cir. 1991) (noting the "'critical distinction' between a continuing act and a singular act that brings continuing consequences in its

roiled wake" (quoting <u>Altair Corp.</u> v. <u>Pesquera de Busquets</u>, 769 F.2d 30, 32 (1st Cir. 1985))).

A complaint about the ongoing effects of the 2000 amendment to Rule LXX is not a continuing violation. Indeed, the very concept of a facial takings challenge is that the "mere enactment of the statute amounted to a taking." <u>Suitum</u>, 520 U.S. at 736. This reasoning also requires rejecting the application of the continuing violation doctrine to facial takings claims, as several circuits have held. <u>See</u>, <u>e.g.</u>, <u>Colony Cove Props., LLC</u> v. <u>City of Carson</u>, 640 F.3d 948, 956 (9th Cir. 2011) ("[I]n the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed." (quoting <u>Guggenheim</u> v. <u>City of Goleta</u>, 638 F.3d 1111, 1119 (9th Cir. 2010))); <u>New Pulaski Co.</u> v. <u>Mayor & City Council of Balt.</u>, Nos. 97-2118, 97-2204, 2000 WL 1005207, at *6 (4th Cir. July 20, 2000) (rejecting continuing violation theory in the context of a facial challenge to an ordinance, holding that "any taking occurred at the time of the Moratorium's enactment"); <u>Kuhnle Bros., Inc.</u> v. <u>Cnty. of Geauga</u>, 103 F.3d 516, 521 (6th Cir. 1997) ("Any deprivation of property that [plaintiff] suffered was fully effectuated when Resolution 91-87 was enacted, and the statute of limitations began to run at that time.").

-20-

This is so despite the fact that the Association did not know the precise dollar amount that would be subject to Rule LXX in future years. The Association was aware that the Rule would operate automatically on all profits earned after the Rule came into effect. Its application to future earnings was mechanical and automatic. The transfer of funds into the Special Reserve each year is simply a harmful effect of the passage of Rule LXX, the underlying source of the Association's complaint. Thus, the continuing violation doctrine is inapposite. Cf. Gilbert, 932 F.2d at 59 (rejecting continuing violation theory in the context of an as-applied takings challenge to a permit denial, explaining that "[w]hatever harms were suffered add up to nothing more than the predictable, albeit painful, consequences of the permit denial").

The facial takings claims regarding Rule LXX are time-barred.[12]

B. The Audit and the Interpretation

The Association never articulated a clear, distinct claim regarding the audit, the repayment orders, and the Commissioner's interpretation that other property was subject to

_____

[12]  The Association also argues, for the first time on appeal, that its claims were brought directly under the Constitution, and thus subject to a different statute of limitations, and that statutes of limitations are inapplicable to claims for prospective relief for constitutional violations. As neither argument was raised before the district court, they are waived. Chiang v. Verizon New Eng. Inc., 595 F.3d 26, 42 (1st Cir. 2010)

-21-

the Special Reserve requirements in the district court, and so has waived any such claim. We do not decide whether such a claim would have been timely, whether there is a takings claim, or whether, if so, it would be a facial or an as-applied challenge.

The complaint does not contain any mention of the audit, nor did the Association request any relief regarding the audit, despite the fact that the complaint was filed on November 4, 2008 - nearly five months after the audit resolution was issued on June 12, 2008. Similarly, the opposition to the motion to dismiss makes no claim regarding the audit; it explains that the Association raises only "a facial challenge to the section of Rule LXX which establishes the Special Reserve." The Association did not argue the effects of the audit should be viewed differently than its challenge to Rule LXX until its opposition to the Commissioner's motion for summary judgment, where the Association stated, without analysis, that "this announcement of a new official policy constitutes an additional violation of the Association's constitutional rights under the Fifth Amendment which would entitle the Association to seek judicial redress."

The district court did not assess the timeliness of any claim regarding the audit, because it found the belated assertion was "in the nature of an as-applied takings challenge." Asociación de Suscripción, 720 F. Supp. 2d at 158. The district court determined that such a claim was not before it, because the

Association had stated it was "bringing only a facial challenge to the regulation in question." Id.

Given the Association's failure to raise the issue of the audit resolution in the complaint or at any time before its response to the Commissioner's summary judgment motion, or even to assert it was a separate facial claim, this determination was not error. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); see also Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) (collecting cases).

IV.

We affirm dismissal of the action.